(14 Misc. Rep. 63.)

### KAHN v. HOES et al.

(Supreme Court, Special Term, New York County.   September, 1895.)

LOST WILL—ACTION TO ESTABLISH—EVIDENCE.

> In an action to establish a lost will, alleged to have been made 18 years before, giving to plaintiff, who was not related to decedent, about half of decedent's estate, to the exclusion of his wife and son, plaintiff produced an alleged copy of the will which recited that the legacy was given to plaintiff because of his various acts of kindness to decedent. Plaintiff and two witnesses, his brother and cousin, testified in detail as to what occurred at the execution of the will, and identified the copy as the original draft. Plaintiff testified that he had the will in his possession until a few months before, when he removed from one office to another, after which he could not find the will. One of plaintiff's witnesses testified that, shortly before his death, decedent told him (witness) that he gave plaintiff the legacy because he had shown him more kindness than his wife and son. It appeared, however, that, though they both lived in New York City, plaintiff had not seen or had any communication with decedent for 10 years before his death, and had even forgotten his first name. When plaintiff heard of testator's death, and that his estate was in the hands of the public administrator, he wrote to the public administrator that he (plaintiff) had written decedent's will, and was in possession of it, if he had not delivered it to decedent, and that he would file the will if in his possession, but he did not mention that he was a legatee, or that he had recently seen the will. *Held*, that the evidence was not sufficient to establish the alleged will.

Action by Aaron Kahn against William M. Hoes, public administrator, and others to establish an alleged lost will.   Complaint dismissed.

Edward C. James, for plaintiff.

F. W. Arnold, for defendant Hoes.

L. H. Arnold, for defendant Reiner.

BEEKMAN, J.   Michael Reiner died on or about the 27th day of July, 1893, in the city of New York, leaving, him surviving, his wife and one child, the defendant Moses Reiner.   In the month of August following, administration upon his estate was granted to the public administrator, who thereupon entered upon the performance of his duties in respect thereto.   The plaintiff, claiming that the deceased was testate, and that he was a legatee under the will, brings this action against the public administrator, the widow, and the son of deceased, to establish the will as a lost will, and, upon the issues raised by the answers, is put to his proof of the making of the will, its existence, in legal contemplation, at the time of testator's death, and its loss.   The will, as set forth in the complaint, reads as follows:

"In the name of God, amen.   I declare this to be my last will and testament:

"First. I give and bequeath to Aaron Kahn, my attorney, the sum of thirty thousand ($30,000) dollars, for the reason and on the ground that he was a faithful and true friend, having advised me professionally without exacting compensation, and loaned me moneys when and how I needed the same without exacting interest for the use of the same or any token in writing, relying entirely on my verbal promise.

"Second. I also appoint Aaron Kahn as my executor.   It is my wish that he need not give bonds for the trust, nor is any bonds to be required for the execution of the trust.

"Third. After the payment of the legacy in paragraph first of this will, it is my wish that the balance remaining in real and personal property is to be converted into cash, and to be distributed, share and share alike, to my family, consisting of my wife and son, after all the debts are paid.

"In witness whereof, I have hereunto set my hand and seal this 2d day of December, 1878."

While the statutory provisions under which such an action is maintainable are remedial in their nature and benignant in their purpose, and should, therefore, be liberally construed and applied, still it is not to be forgotten that the law has in this state always exacted great particularity of proof in respect to testamentary acts and the observance of formalities intended to make the proof as nearly as may be a demonstration that the testator was capable and fully conscious of the nature of his act. This extreme caution obviously arises from the essential privacy of the act itself, which does not become the subject of proof until the mouth of the chief actor is closed by death, and the consequent ease and safety with which fraudulent wills might be concocted and maintained. As little as possible is left to the uncertainty of recollection or the operation of fraudulent design, in the requirements that the will shall be in writing, subscribed and published by the testator and authenticated by two witnesses, selected by him and subscribing their names in his presence in attestation of due execution. It will be seen that the chief value of these precautionary requirements rests upon the production of the document itself when rights are asserted under it, and that its absence opens the door to the uncertainties and fraudulent designs against which the statute was intended to provide. Experience, however, has demonstrated the necessity of providing for the cases where wills which had been duly executed were lost or fraudulently destroyed, and could not, therefore, be produced for probate, and in order that the rigor of the statute should not defeat a duly-executed testamentary act, or in its operation to prevent one kind of fraud work another, provision has been made for the establishment of wills where, through loss or destruction by action or design, the paper cannot be produced. But in so doing the legislature has also sought in some measure to provide against the dangerous consequences imminent upon this relaxation of the rule by prescribing a special quality of proof in such cases. Section 1865 of the Code of Civil Procedure provides as follows:

"But the plaintiff is not entitled to a judgment establishing a lost or destroyed will, as prescribed in this article, unless the will was in existence at the time of the testator's death, or was fraudulently destroyed in his lifetime; and its provisions are clearly and distinctly proved by at least two credible witnesses, a correct copy or draft being equivalent to one witness."

The burden of proof rests upon the plaintiff, and reason as well as the policy of the law demands that the proof should be clear and convincing, not only in respect to the provisions of the will, but as well that it was in existence at the time of the testator's death. The plaintiff is confronted at the outset by the presumption of revocation, in which the law indulges where a will shown to have been made cannot be found after decease, a presumption which he must overcome by evidence satisfactorily accounting for the absence of the

paper upon some other theory. Upon a very careful examination of the evidence in this case, I am of the opinion that the plaintiff has not sustained the burden thus resting upon him. The testimony shows that the deceased was a foreigner, having a very limited acquaintance with our language, who came to this country about the year 1870. He was engaged in business in a small way as a peddler of jewelry and lottery tickets, living meanly, and extremely penurious in his habits. The plaintiff claims to have befriended him in various ways, including loans of money and the giving of gratuitous legal advice, and that the will in question was the outcome of a sense of gratitude on the part of the deceased for past favors. What may have been the extent or precise character of these services does not appear as matter of proof, so that we are unable to judge of the reasonableness of the motive ascribed to the testator. The evidence offered on the part of the plaintiff in respect to the making of the will is to the following effect: A few days prior to December 2, 1878, the day on which the alleged will bears date, the deceased called upon the plaintiff at his office, No. 290 Broadway, in this city, and requested him to draw his will according to instructions which he then gave. This was done, and on the above-mentioned date the deceased attended at the plaintiff's office and executed the will in the presence of the plaintiff, the plaintiff's brother, Isaac Kahn, his cousin, Jacob Tobias, and a law clerk, Edward Cumisky, the last two only acting as subscribing witnesses. Cumisky died before the trial, so that what took place on the occasion rests entirely upon the evidence of the plaintiff's two relatives. The evidence is quite exact in its bearing upon every condition essential to a full, free, and intelligent testamentary act, in conformity with every requirement of the statute, and if full credit is to be given to the witnesses there can be no question of the fact that the will propounded for probate was duly executed and fully embodied the actual testamentary intentions of the testator. A draft of the will was first prepared by the plaintiff in his own handwriting, from which the original was engrossed by the witness Tobias. The two were compared in the presence and hearing of deceased and the other witnesses, and upon the execution of the will the original was handed by deceased to the plaintiff. The further proof of the continued existence of the will rests solely upon the evidence of the plaintiff. He testifies that he put it in one of the pigeon holes of his desk in an envelope; that he saw it there from time to time as he looked over his papers; that he removed from his office twice after the execution of the will, the last time in the month of May, 1893, some two months before the death of the decedent, when he saw and handled the document, placing it with other papers in a basket for removal to his new office. Since that time he states that he has been unable to find it, and claims that it was lost in the course of his last removal. He has produced, however, a paper in his own handwriting which the witnesses Isaac Kahn and Jacob Tobias assumed on the trial, after the lapse of some 17 years, to identify as the draft from which the original will was transcribed, and which was used for purposes of comparison in the presence of the deceased on the day when the will is said to have been executed. This

paper is not only asserted to be the original draft, but purports also to be an exact copy of the will as executed, bearing upon it, in the plaintiff's handwriting, the name of the deceased at the place of subscription, and the names of the subscribing witnesses and their residences at the end of the attestation clause. These additions the plaintiff says he made immediately after the will was executed, and the paper thus completed was placed in a pigeonhole in his desk, the same desk in which it is claimed that the original will was also deposited. The plaintiff states that the desk was not locked, and that while, in going over his papers from time to time, he had seen the original will, or rather the envelope in which it had been placed, he did not see this draft from the time of the alleged execution of the will to the day when, in pursuit of the original, after Mr. Reiner's death, he found it in his desk.

It will thus be seen that one essential branch of the case, namely, the existence of the will at the time of the decease of Reiner, rests wholly upon the evidence of the plaintiff. It is, therefore, of vital importance that his testimony should be subjected to a most critical examination. In the first place, he is deeply interested in the result, and under an incentive to support his claim proportioned to the amount involved and the fact that success or failure must depend upon his own testimony. To such an extent does the law recognize the operation of self-interest upon the credibility of a party to an action that the determination of the facts must still be left to a jury where they rest upon the evidence of a party, although a direction of a verdict would have been proper if the same facts had been testified to by a disinterested witness. The mind refuses to be satisfied with such evidence alone, and naturally seeks some corroborative proof,—some evidence which shall incline the probabilities of the case in favor of the claim. Is there such evidence in this case? It seems to me quite clear that there is not. The plaintiff naturally sought to lay the foundation for the reasonableness of the will by showing that he had won the affection of the deceased; that the relations between the latter and his wife and son were unfriendly, and that this legacy of $30,000 was prompted by feelings of gratitude for kindly acts received by him at the hands of the plaintiff. There is some evidence in the case tending to show that there was an estrangement between the deceased and his wife. At all events, she remained in Austria when he came to this country, and never saw him during the period of 20 years or more which covered his sojourn in this country before his death. While his relations with his son seem to have been friendly, they did not commence until after the month of May, 1882, when the latter came to this country. But the force of this claim of hostility to his family is somewhat weakened by the fact that the alleged will upon which the plaintiff stands makes the wife and son residuary legatees on an equal footing, a fact which hardly fits in with the hostile or indifferent attitude of the deceased towards his family which is claimed to have existed at the time the alleged will bears date. The extent of the attachment of the deceased towards the plaintiff rests, it may be said, almost entirely upon the evidence of the witness Lewis Fisher, who testifies to a

slight acquaintance with the deceased in the years 1878 and 1879. He says that he did not see him again until May, 1893, when he met him in the street, and in a conversation which ensued he testifies to the following statements made by the deceased:

"I said, 'You are speaking so much about saving. How much have you got?' He said, '$50,000 or $60,000.' I said, 'What are you going to do with it?' He said, 'I am going to give Aaron Kahn $30,000, and the balance goes to my wife and son.' I said, 'What do you give it to Aaron for, all this amount of money?' He said, 'He has always been a good friend of mine, a faithful adviser, and always loaned me money on several occasions.' Q. What did you say to that? A. I said, 'That is very kind of you, indeed. Everybody won't do that.' * * *"

The witness also stated that the deceased said something about his wife not treating him right, and that he was not living with his son, and that the plaintiff "has been a better friend to me than my wife and son." On cross-examination the witness says that his question of the deceased, and the latter's response on this point, were:

" 'Why do you leave all that money to him, and just so much to your wife and child?' He said, 'My wife and child is not as good to me as he is,' or words to that effect. * * *"

The evidence was, of course, of the highest importance. It was intended to show not only the warmth of the attachment of the deceased to the plaintiff, but also, by the deceased's own declaration, made but two months before his decease, that he had made a will in exact correspondence with the one sought to be probated, even to the declaration of the same motives of gratitude which the alleged will recites as the reason for the bequest to the plaintiff; not only this, but also that this will had not then been revoked by the deceased, but was believed by him to be still in existence; and in this connection it will be recalled that this interview is placed in the same month in which the plaintiff swears that he last saw the will. In weighing the evidence of this witness we are confronted with two facts which very seriously impair its veracity. The plaintiff himself testifies that the last time he saw the deceased was in the year 1883, ten years before the alleged interview. During all that time they were living in the city of New York, within easy reach of one another, and yet they never met. All intercourse between them appears to have ceased, and they continued from 1883 down to the death of the deceased to be absolute strangers to each other. So complete was the estrangement that the plaintiff himself testifies that when he learned of the death of Reiner he had forgotten his first name. The words put in the mouth of the deceased by the witness Fisher, and the attitude of grateful friendship towards the plaintiff which he pictures, are not commonly consistent with a previous suspension of all intercourse of many years' standing; and the unnaturalness of it breeds a sense of improbability of the whole story, a feeling intensified to conviction by the extraordinary statement of the witness himself, that he had not disclosed this interview to the plaintiff until the day on which he took the witness stand and swore to it. The witness is a first cousin of the plaintiff, with whom he has been on terms of friendly intercourse. He was the guest of the plaintiff for some three weeks at the Catskills in July, 1894, after this suit had been com-

menced, and, according to the testimony of plaintiff, was present at a controversy between Dr. Cahn and the plaintiff respecting the matter of this will. The evidence was important, and the witness an intelligent man, capable of appreciating its weight. If such an interview had taken place, he would have immediately communicated it to the plaintiff upon his learning of the controversy over the will, for that is what common experience teaches us is done by men under similar conditions and circumstances. What he did do was quite otherwise. Let his own testimony speak for him:

"Q. When did you first tell your cousin about the conversation with Reiner? A. I did not tell him about the conversation I had downstairs. He asked me if I remembered Mr. Reiner, about a week ago, and I said 'Yes.' Then I said, 'I can recall some little conversation that we had together.' I did not tell him what it was until he heard it here this very day."

No explanation of this unnatural reticence is offered. Unexplained, it is in itself enough to excite doubt, and to suggest a shallow attempt on the part of the witness to avert suspicion of concert of action in the manufacturing of the story, and to give to his testimony the air of an unpremeditated narration. The testimony of the witness is so improbable, and bears such marks of invention, that I am unable to credit it, and, therefore, reject this alleged interview with the deceased as a fabrication.

I now come to a consideration of the testimony of the plaintiff himself. As I have already stated, the evidence of the existence of the will at the time of the death of the deceased depends wholly upon his testimony. He swears positively that he saw the will last in the month of May, 1893, and yet only three months afterwards he writes a letter to the public administrator in which he says:

"I just learned that Reiner died and you administered on his estate. I was his attorney during his lifetime and drew his will, which I think I have, *if I did not deliver it to him personally.* I have been on my vacation here since July 17, 1893. Reiner died during and since that time, and I shall return to city on September 1, 1893, when my vacation will be up, and shall then file the will, *if in my possession.*"

The italics are mine. It was at this time, also, as the plaintiff testifies, that his recollection served him only so far that, while he remembered he had drawn the will and that it contained a legacy in his favor, he did not recall the amount. Even the first name of the testator, his former friend, had faded from his mind, and, though he now testifies that but three months before this letter was written he had seen the will, he writes to the public administrator in words of doubt as to his possession of it, and suggests that he may have delivered it to the deceased personally. As he fixes the year 1883 as the latest date on which he had seen the deceased, such delivery, the possibility of which he suggests, must have taken place, if at all, at least some 10 years before the death of the deceased. He fails to give any explanation of this inconsistency between the letter and his testimony. The suggestion of the letter that he may have delivered the will to his client, and his forgetfulness of his client's first name at about the same time, accord better with the theory that he had not seen the will in his office, as he now testifies, than that he had. The testimony of Mr. Lindner, who conversed with the plain-

tiff at the Catskills when the report of the death of Michael Reiner appeared in the newspapers, gives support to this view.     There can be little doubt of the fact that the plaintiff had the deceased in mind when he said to Mr. Lindner that he had done business for Mr. Reiner, that he had not seen him for a considerable time, and that there was a small balance due him which he thought he could collect. Why did he not mention the fact that he was a legatee under his will, or at least that he was the executor?     The whole of this conversation with Mr. Lindner, even when taken with the subsequent version and explanation of it given by the plaintiff, weighs against the claim upon which he has predicated his action.     Is it credible, in view of all these considerations, that the plaintiff could have seen the will in May, 1893, as he has testified he did?     I think not, and, upon a careful consideration of the whole case, I am compelled to find that there is a lack of credible proof that the will was in existence at the time of the death of decedent.     I am also of the opinion that there is a fatal doubt in respect to the execution of the will itself. The proofs in this regard rest upon the evidence of Jacob Tobias, a cousin of plaintiff and one of the subscribing witnesses, and Isaac Kahn, the brother of the plaintiff.     The former, after a lapse of 16 years since the alleged execution of the paper, testifies with remarkable accuracy to everything that was said and done on the occasion down to the smallest detail, a feat possible only in the case of a memory of exceptional strength; and yet, only a week before this evidence was given, he said to Mr. Little, a lawyer who called upon him' at Pittsburgh, at the instance of the public administrator, and showed him a copy of the alleged will, that he had signed some paper of Reiner's, but could not tell whether it was that paper or not, and that they would have to refresh his recollection on the subject before he could testify.     In May, 1894, some eight months before the trial, Dr. Cahn also called upon the witness at Pittsburgh at the request of the public administrator.     He states that the witness then said that he did not remember signing any will and would have nothing to do with the case.     In view of this, the remarkable fecundity of his memory on the witness stand but a short time afterwards gravely detracts from his credibility, and renders his testimony of little worth when weighed with the other facts of the case, suggesting inferences distinctly unfavorable to the bona fides of the plaintiff's claim.

The other subscribing witness, Edward Cumisky, died before the trial, and the only other person produced to prove the will and its execution was Isaac Kahn, the brother of this plaintiff.     He was not a subscribing witness.     He says he refused to become one because of the legacy in favor of his brother.     At the time of the alleged execution of the will he was 17 years of age, and happened to be a visitor at the plaintiff's office when the will was executed.     After a lapse of 17 years he shows the same remarkable recollection of details, even to the phraseology of the will and the physical appearance of the draft which is in evidence, which, as I have said, tends to deepen rather than allay doubts which have arisen respecting the facts.     Several witnesses were produced on behalf of the defendants,

whose evidence tended to show that the plaintiff had been busy in efforts to build up his case by sinister methods. I shall not undertake to review this evidence. It is sufficient to say that, upon the whole case, and after a careful consideration of all the evidence, I have come to the conclusion that the plaintiff has failed to sustain the burden of proof resting upon him, not only in respect to the existence of the will at the time of the decease of Michael Reiner, but also in respect to the execution of the paper, and that the facts upon which he claims judgment in his favor have not been credibly established.

The complaint should, therefore, be dismissed upon the merits, with costs.

### CAMPBELL v. CAMPBELL.